Department of Health and Human Services. Mr. Seaberg for the Appellant. Mr. Tate for the Appellee. May it please the Court. Good morning. Good morning. I would like to reserve three minutes for rebuttal. After the United States Department of Agriculture found that airlines transporting primates into the United States were failing to provide these animals with minimal amounts of food, water, or ventilation, PETA submitted a FOIA request to the CDC for primate import notifications submitted to the agency around the same time period. For three primary reasons, the CDC was not entitled to withhold the crate descriptions, animal quantities, and carrier names appearing in those records as a matter of summary judgment. First, all of the vague harms offered by the government's declarants were rebutted by a combination of the import documents themselves, the government's concessions, public records, and the importer's own advertisements. Second, the district court rightly recognized that there was a credibility issue with the government's only witnesses regarding crate and quantity information. The district court erred by resolving that issue, at least in part, against the non-movement at the summary judgment stage. And finally, on the government's motion for reconsideration, the district court erred by permitting the government to withhold primate import records for two additional importers solely because they wanted those records withheld and not because disclosure would result in substantial competitive harm. Just one question at the outset, so you don't have an issue with the fourth category? Exporters? No. While we obviously disagree with the court's holding, we're not challenging it. Except with regard to SNBL, USA, and Central State Primates, the two importers in the motion for reconsideration. Since you mentioned your... I assume you're going to go through those issues in order, but since you mentioned the motion for reconsideration, so I went back and looked at your motion. You argued, you filed that motion under 60B1, which allows for relief from mistake, inadvertence, surprise, or excusable neglect, right? And under B3, which is for fraud and misrepresentation. So for you to prevail here, you have to show that the district court abused its discretion on those standards. That is, you have to show that when the district court didn't find either fraud or misrepresentation or excusable neglect, that that was an abuse of discretion. I didn't see that argument anywhere in your brief. Your Honor, that's because we're not making it. You're not? We're not challenging the Rule 60B3 ruling in our brief. The Rule 60B1 argument, the court actually granted that motion in part. It ordered, as a result, that the information for... No, I'm not talking about the government's motion. I'm talking about your motion. Yes, the court did grant our motion in part. But didn't you file your motion under 60B1 and B3? Yes, Your Honor. There were competing motions. That was your motion, correct? Yes. The motion I alluded to in my opening was the government's motion for reconsideration. Oh, okay. But what about this one? I got you. Do you want to say something about this? Sure. About your own rule? Because you are challenging that here, too, correct? We're challenging... The district court's failure to grant those two motions. We're not challenging the 60B3 motion. We're challenging, after the court granted our motion to reconsider under 60B1, which it did at Joint Appendix 394, we're challenging how it resolved the merits of the issues. Under the Dyson case and the Connors case that we cited in our brief, we believe it's a two-step process. So first, the court considers whether to reconsider. And it did that for the 60B1 motion. And then at that point, the court has to look at the underlying merits, as it would with any other standard. The standard review would have been applying at summary judgment. And the review there is de novo, as we pointed out in our brief. So the point we raised in our 60B1 motion, it was a combination of the court's mistake and PETA's mistake. We pointed out that neither primate products nor worldwide primates, the two declarants, had actually asked for this information to be withheld, despite their false testimony that they did. And that was the sole evidence that the court relied on at the summary judgment stage. The court acknowledged that at Joint Appendix 394, and pointed out that despite their testimony regarding the importance of this information, both demonstrated that they are, in fact, not sufficiently concerned about this information for it to be withheld. Where the issue is for us, Your Honor, is that the court, nonetheless, citing and spotting that credibility issue, still weighted that testimony in part as a basis for withholding the records submitted by the other importers, the other eight importers. And our argument is that under the Washington Post case we referenced in our brief, the Sherwood case that we referenced in our brief, the court had to stop there. It's the government's burden to prove that these documents were lawfully withheld. When the only two witnesses who could have carried that burden, there is a serious credibility issue with their testimony. It couldn't – a reasonable fact finder, in the end, could ultimately disregard all of that testimony. Then the government couldn't have carried its burden as a matter of summary judgment. And I will just also clarify the reason why it's so important it's a de novo review here, Your Honor, is because, at least with regard to crate information, PETA actually raised all the arguments at summary judgment. The court just missed them and didn't address them. So we believe that it should be a de novo standard review as to an abuse of discretion. If I can turn to the actual testimony itself, with regard to crate information, again, it was the government's burden to prove that disclosure was likely to result in a substantial competitive harm. The only evidence that was offered was one line in the primate products declaration speculating that crates can provide insight into the size or type of primate imported. But first, the district court already ordered the disclosure of type or species of primate, so the only thing that would be left there would be size. And there was no evidence in the record suggesting that size was valuable. And even if there had been, the import records themselves proved that these calculations weren't possible. We went through in our brief cited how sometimes it's just the number of boxes or a reference to an international transportation association requirement. And I think if we set all of those issues aside, finally, the testimony is merely what can or could happen. The government's burden here was to prove a likely and substantial injury. So as a matter of law, this could not have carried the government's burden. Turning to quantity information, the government fared no better. PETA established four uncontested facts that rebutted the harms alleged by primate importation is just a supplement to domestic breeding. This is critical because primate worldwide primates claims that you can actually calculate sales, actual sales data on the basis of these import quantities alone. But that's simply not true. It's just a supplement to the overall picture of the overall capacity to provide these primates. And also in many cases, well, not necessarily many cases, but at least in some cases, which we highlight in our brief, the companies submitting the import quantities to the CDC, the importer of record, is not the actual owner of the primates. So it's generally a quarantine. In some cases, it's a quarantine facility. And at least for at least four of the importers, the quarantine facility merely holds the primates for 31 days under the regulation at issue. And there's testimony in central state primates as a quarantine facility. At Joint Appendix 345, primate products is. At Joint Appendix 343, worldwide primates is. At Joint Appendix 81 and Buckshire, another importer, is at Joint Appendix 53. We point out in some cases you can tell who the true owner is. In some cases, you can't. And under the regulation, it doesn't appear that you're ever obligated to disclose the true owner. So it's not even clear who owns the primates and would go on to sell them. So this doesn't actually reveal sales activity or overall capacity to provide and import a primate. And I want to add, even if it did, the evidence before the court shows that sales turn on nearly a dozen factors that just aren't at issue here and won't be revealed. It includes the age of the primate, the sex, sexual maturity, whether the primate's pregnant or not, if it's captive bred or wild caught, if it's free of specific pathogens. This is all at Joint Appendix 48 to 52, where there's the actual sales listings. And I'll add, for a company that worldwide primates who's offering this testimony, they don't just sell live animals. It shows there they sell blood, serum, plasma, organs, antibodies. So this notion that you can calculate sales percentages, ultimate sales activity, based on the imports alone, it's not founded in the record. And the last point I would just like to make is that the USDA was already posting precise inventories that revealed by species the exact number of primates that the sole harm alleged by primate products stems from what could happen if a competitor learned that currently, or even a few years ago, a company had a certain number of a particular primate in its inventory. So this completely, the fact that this information was already available completely undercuts that harm. I think it also creates a material question in fact, for the other harms alleged by worldwide primates. Because the court's analysis in an Exemption 4 case, it has to take into account the information that's already publicly available. And you see this in the Niagara Mohawk power case that we referenced in our brief, where there's the, what was at issue was the release of actual power consumption data. But the court noted that projected power consumption data was already available. It acknowledged while those two things are different, it's possible that the disclosure of the actual data may reveal so little, may add so little to what's already out there, that there won't be the substantial competitive injury that's required under the law. Turning to the airline information. May I ask a question? Might it be that you're missing the forest for the trees? I mean, is, all the government needs to show here under Exemption 4, as I understand it, is that if this information is released, a competitor can, and I think the phrase is reverse, I think the phrase reverse engineering was used, maybe that was just in my notes, but a competitor could reverse engineer the supply chain and other information to gain a competitive advantage in a small market that's highly competitive. Isn't that what we're supposed to be looking at? And that doesn't seem to me to be a very difficult burden to be able to carry off. Well, Your Honor, I think I have a legal response and a factual response. On the legal issue, I think there's an important distinction in the 2004 McConnell Douglas case that the government cites, that there's a distinction. In that case, it was whether or not you could reverse engineer line item pricing. And the court explained, there's a distinction between being able to calculate the profit margin through, or by reverse engineering the line item price, and that's one thing. But what needs to be proved is that it will result in a substantial competitive injury. And on this record, we don't believe that it can be. There, the testimony that was regarding reverse engineering the profit margin. There's a distinction that if there's a competitor out there, you don't think a competitor could take this information and gain some advantage. Gain information that they wouldn't otherwise have access to. It's not available freely on the market, but it's only available because of the government information being released. You don't think that exists? Well, Judge Griffith, I don't. I think, so part of the issue is that testimony was in on appeal. So I think the court actually has to look at these discrete pieces of information and then these pieces collectively. It's a materially different question than what was below. I'd also point out with regard to kind of this notion that the sales and everything can be reverse engineered. All the information that's in the record about what's already available regarding quantities, showing that this is just one small picture of the overall business. I think that creates a material question of fact. And I think this kind of gets back to what I would argue is under the Niagara Mohawk Power case, the Greenberg case we cite. There is an issue as to whether this can actually be done, right? So there's a reverse engineering of a supply chain in the Trans-Pacific Policing case. There was precise testimony identifying how specific information at issue could be paired with an already publicly available inward vessel manifest document. And that was laid out and it was unrebutted. And I think in that type of case, then there is some sort of reverse engineering that can be found. Here on this record, the testimony doesn't suggest how that can be done. At most there are vague harms alleged that will provide competitive insight or reveal unique advantages. And those are precisely the types of harms that were rejected in the 1999 public citizen case that we cite in our brief. If I can just turn to airline. Yeah, I was going to ask you about the airline question, but do we owe any deference to the agency's judgment about this? Your Honor, I don't believe that we do. I think the CNA financial case is kind of the first case where this occurs, where you're talking about a reverse FOIA case. And the court's very clear that the deference is because it is filed pursuant to the Administrative Procedure Act. It's a different standard of review. And there's also a reference into the deferring to agency expertise in that case. In the CNA financial case, the agency actually hired an outside consultant to provide an opinion on the results of disclosing that information. Here, the agency's declarants in this case, they didn't even mention quantum aircraft information in their declaration. So there's really no evidence that they were exercising any type of expertise. Okay, so why don't you go ahead and you wanted to move on to airline information. Why don't you say something about that? Yes, Your Honor. I see that I'm out of time. That's okay. I'd like to hear your answer to the airline. Yes. So the fundamental premise alleged by both Worldwide Primates and Primate Products was that it's difficult to locate the airlines willing to accept these shipments. Now, PETA proved that the names of airlines... Well, actually, they said in the block affidavit, they said that it's the single most time-consuming logistical portion of the effort, getting the airlines right. Yes. That's what he says. And I think that the evidence that we presented created, at a minimum, a material question of fact about that, because we proved that the names of airlines are publicly available who transfer primates. They're highly publicized. And where the airline names were not redacted, it showed that the importers were already using the same ones. And I do want to point out the government conceded at Joint Appendix 106, Note 9, in its brief, that the importers already know which airlines will accept their business. So that completely undercuts everything that Primate Products and Worldwide Primates allege. I think the critical issue that's left that the government is trying to use to resuscitate this harm claim is it's saying there's a difference between shipment-by-shipment data and just these industry-wide lists. But I would argue that the testimony that's in these declarations goes to the contrary. The allegation is merely that locating the airlines is difficult. And I think if you contrast the block declaration at Paragraph 7 discussing airlines, saying they're difficult to locate, with the block declaration at Paragraph 8, where it's saying it's the relationships with exporters are actually, they should be considered trade secrets because they're developed at time, effort, and expense. I think you can actually see the contrast in that those relationships are not valuable. Okay. Thank you. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. Damon Tafe representing the appellees in this case. In the Trans-Pacific Policing case, the Court looked at the precise nature and origin of the shipments at issue and it held that information that could reveal those precise natures and origins was core supply chain information. And likewise, in the National Parks case, it looked at a district court's review, as is happening here, in which the district court found that substantial evidence supported that conclusion and it said that the district court need only exercise its judgment in view of the nature of the material sought and the competitive circumstances in which the submitters do business. We submit that that's exactly what the district court did here with the information in front of it. And before I get into the specifics, I think it's worth pointing out that the information we're talking about here, airline information, quantity of imports, the crates used in imports, as well as the exporter information that we now understand is conceded in large part, these are core supply chain pieces of information. These are things that in any case in which an importer has as its first line of business importing things from abroad, these are items that are core to the entire structure of the way that company does business. And the way that PETA proposes to examine this on kind of an atomistic level is revealing. Because what they say is that if we only ask for a particular type of crate or a particular type of quantity or airline information, then those items by themselves are not enough to reverse engineer, as Judge Griffiths said, the entire system. And these cases don't exist in the abstract. In this case, a FOIA petitioner could request airline information and not exporters, as is now PETA's apparent position. In the next case, they could simply request exporters and say, well, we're not asking for airline information, so we don't have that necessary piece. But these are all pieces of an interrelated jigsaw, and the companies at issue here are extremely worried not only about PETA and the effects that its protesting would have, but because these are finite sources of supply. And I would note parenthetically that we did argue below that PETA itself and the damage that its sort of social protesting could cause could inflict competitive harm. The district court rejected that based on this court's decision in public citizen versus federal versus FDA, where the court held that the competitive harm at issue is only affirmative use by competitors in the industry. And based on that holding, we didn't brief that issue further here. I'm noting it only because in the event that we need to seek in-bank reconsideration on that issue, simply pointing out that we're not conceding it. And in the views of the importers here, the notion that competitive harm would result is as surely true if one can imagine, for example, that there are ten importers in this industry, and maybe one of those importers works with one specific airline. Now, if PETA learns the existence of that airline and uses social pressure to convince that airline no longer to participate in this industry, then that one specific importer that relied exclusively on that airline is effectively no longer able to compete on the same footing. Mr. Sievers, I thought I heard him say on the airline question that this airline information is already public. Is that not? It's not clear that that's true. But that's a pretty important question. I mean, if it's public, then... It's not clear to the extent to which that's correct. If you look at Joint Appendix 134 and 135, which is their evidence on this point, they list in the printout there five airlines. United, British, Amerijet, Air China, and South African. Now, sort of in the caption to that field, it suggests that they're listing one of airlines one of five of nine. And I don't know what the remaining four airlines are. Actually, in preparation for oral argument, I went to this very search tool, and I tried to recreate what they've done here. And this search functionality no longer exists. I conferred with PETA's counsel on this, and I believe we agree. But the reason that's important is because in the information that the court reviewed in camera at the reconsideration stage, which is when it was trying to figure out what worldwide primates and PPI actually requested to be withheld, I went through there and there are airlines listed there that are not among these five. So it's not entirely clear, actually, to what extent this is a categorical list. And in any event, it certainly doesn't cover all of the potential charter airlines out there. I thought the distinction that was drawn on the publicly available information wasn't what you're saying now, if I understand what you're saying now, but was that there's a meaningful distinction between aggregate industry-wide data and shipment-by-shipment data. It's both, Your Honor. The answer to Judge Tatel's question, he asked me whether these are not quite clear, but you're also correct in asking the question. You do, I think, because that states our position. Even if it's true that there's a finite universe of airlines and that universe is known, that is still not the same thing as knowing to what extent and how frequently each member of this industry makes use of an individual airline. These have infinite capacity. They don't have an innumerable number of routes that they fly. And indeed, revealing what airline is used may, in fact, give insight into what the origin and the destination, because not all airlines fly all conceivable routes. And so that's another way of getting insight into what exporters these folks might be using in certain theaters. And on that note, it's important to understand that when the district court looked at this, as Your Honor said, it didn't look at it as just a question of what is the nature of the industry as a whole and what information is public. It thought that that was too broad a line to draw. The question, of course, is, objectively speaking, would competitive harm result from the release of the information at issue here? And the information at issue here is not simply which airlines are in this business, which airlines are licensed to do this and which are willing to do it. The information here is which airlines are working with which specific importers. And from a competitive point of view, maybe it's best to look at it the other way. Which importers are looking at which specific airlines? Because in the worlds of finite capacity and a small competitive market, which PETA conceded exists here, small margins are important. And one reason to caution deference from a judicial perspective in this instance is it's not always clear to what extent one piece of this jigsaw can be used, not only in that case, but in future cases to recreate the entire nature of the industry. I mean, what the importers are doing here is not rocket science. It's not high technology. All they're doing is they're importing specific animals from specific places, and they're selling them for specific purposes. So if you know, which we now do because the court ordered it to be so, if we now know the species of the animals that are being imported, and we know the way that they're getting into the United States, that is from which airlines, and we know the quantity in which it's happening, and PETA suggests that the inventories themselves are fully available at all times, then one begins to wonder what's left, aside from just the prices that they're charging. I had been thinking about this case maybe a little differently than you had, so help me understand. When I was thinking about Exemption 4 and competitive advantage, I had in mind a competitor who was trying to maybe start a new business and wanted to glean information from confidential information from existing market players. When you talked about social pressure, however, that made me think that maybe there's another way to think about this. Do you think Exemption 4 applies to information that, if released, would be able to be used by PETA to embarrass or protest against one market player? I'd like to say yes, but under this Court's precedence, I have to say no. The Court has ruled that that's not the case, although I'd note that the Second Circuit has gone the other way on that question. I was wondering why you were talking about social pressure. I was merely noting that we're not abandoning that issue because this Court can't abandon its own precedence, but if we went in bank, I just wanted to preserve that issue explicitly as we did in the District Court. So I was thinking about it the right way then, right? From our perspective, yes, but perhaps from this end Court's perspective, not quite yet. With respect to the question of credibility, I just want to explain, because I think it might not be clear, exactly what approach HHS took to this issue. HHS took an objective industry-wide approach. It got all of the responses to the predisclosure notice, and it looked at the justifications that were offered in those PDN responses, as well as the redactions that accompanied those responses. Based on the representations made in that universe of redactions and justifications, it came to an understanding of the nature of the industry and how valuable the importers believed each piece of information was, and its approach was it will apply those standards, if found to be reasonable, which it did find to be reasonable, it will apply those standards industry-wide. But in acknowledgment of the notion that FOIA prefers disclosure over withholding, it said that if an importer responded to the notice, and in some affirmative way suggested that in its case, that particular importer did not object to a particular release, then HHS wouldn't withhold things that the importer itself made no suggestion that it wanted withheld. So that's why, as the District Court observed, there is some arguable inconsistency between withholdings from one importer to the next. But that inconsistency is not a doctrinal inconsistency, it's not a legal inconsistency, and it doesn't reflect HHS's or the importer's views of the industry as a whole. Instead, HHS applied an industry-wide approach, as evidenced by the fact that it applied those standards to Central State Primates, SMBL, and Dallas Zoo Management, despite the fact that they didn't respond to the PDN. It applied it industry-wide, unless a particular importer affirmatively suggested that in its case, it wasn't going to apply a withholding that maybe in HHS's view, it was entitled to. So we think that HHS actually was quite faithful to the way that FOIA has been interpreted and should be interpreted, which is as wide a release as can be justified without causing harms to the regulated entities at issue here. So with respect to the credibility issue that opposing counsel has noted, that is, the role and the block affidavits, the District Court handled this appropriately, in our view. Notably, the District Court, upon realizing it, in the first round of briefing on this issue at summary judgment, PETA noted that PPI itself did not order that quantity or create information to be withheld, but it didn't make the same argument with respect to WWP. So in the District Court's view on summary judgment, the WWP declaration justified withholding on an industry-wide basis. On reconsideration, PETA pointed out that the same thing had happened with WWP as with PPI. That is, the declaration said that those entities requested withholding of these two fields of information, but in the manually highlighted redaction requests, that did not turn out to be correct. So in our view, the District Court did what it should have done. It returned to first principles and said, okay, as to these two entities, in fact, they did not request this information be withheld, even though the arguments that were made would have justified it if they did. But then the District Court was faced with a second question that was more difficult, which is, we have these seven other companies at issue here, and those seven other companies knew that WWP and PPI were submitting declarations at summary judgment. They knew what those declarations said. Those companies, however, had no way of knowing what information WWP and PPI themselves had requested be withheld. And so the other seven companies did request that crate information and quantity be withheld, and they did so on the grounds in these declarations. And that's true, by the way, not only on the face of the declarations, but the PDN responses themselves, which the Court considered at reconsideration, had content. The Covance PDN response was very much along the same arguments that, and that's ECF number 58, Exhibit D, I think, made the same sort of representations and characterized the industry in the same way as the Block and the PPI declarations did. And under an objective standard where it's not what does HHS believe, what do the entities believe, but rather what is objectively true about this industry, the District Court looked at all the evidence in the record and said, you know what, if these two entities didn't request their stuff be withheld, we won't withheld it. But this is an industry-wide question. It goes to the nature of these businesses as a whole, and based on Trans-Pacific Policing and Watkins and Gilda Industries, this is core supply chain information that goes to the heart of the regulated entities' businesses, and they've made the necessary showing, so they're allowed to withhold it to the extent they requested to do so. We request that the Mr. Seager, I think you were out of time, but you can have a minute if you'd like it. Thank you. I'd like to address three things real quickly, Your Honor. First, the counsel for the government is actually incorrect when he says that the information is no longer available to primate carriers. We, this website that used to post the list, it's unclear if they're still going to be posted there, but that's irrelevant for our purposes. Whether they're available under a simple FOIA request or posted on this website, that's not an important difference. It doesn't matter here. They're still publicly available, and I also want to point out the government conceded that the importers already knew the airlines who would accept their business before PETA filed that list that was on the government website, so the government should still be bound to its concession. The government tries to inject a lot of new evidence into the record, talking about what a Covance document said. It's not before the court, and I hope that the court will find that's forfeit. And the last point I want to make is, look, the government had to carry its burden, and it was an objective burden. It had to prove objectively that disclosure would result in a competitive injury. The subjective requests made by the importers... Well, it might likely result in a competitive injury. Yes, likely to result in a substantial competitive injury. And the subjective requests by importers are completely irrelevant here, because as Judge Griffith acknowledged, they want information withheld that's not legally appropriate. They want information, the court dealt with this in the Jurowitz case we cite in our brief at 741 F. 3rd at 1331, where it was information being released to the Humane Society. Dog breeders are saying they're on a crusade to destroy our business. You have to take that into account. And the court said, we're bound by the law of the circuit. Under the law of the circuit, we're limited to the affirmative use of proprietary information by competitors. So what we have here is... And the district court acknowledged that they were making these reduction requests for reasons that were improper. So to rely on subjective requests here, that would not comport with the objective standard that this court is required to apply. Okay. Thank you. Thank you. Case is submitted. Thank you both.
judges: Tatel, Griffith, Srinivasan